# United States Court of Appeals for the Fifth Circuit

_____

No. 21-10556

_____

United States of America,

*Plaintiff—Appellee,*

*versus*

Joshua Seekins,

*Defendant—Appellant.*

_____

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:19-CR-563-1

_____

ON PETITION FOR REHEARING EN BANC

Before Stewart, Elrod, and Graves, *Circuit Judges.*

Per Curiam:

Treating the petition for rehearing en banc as a petition for panel rehearing (5th Cir. R. 35 I.O.P.), the petition for panel rehearing is DENIED. The petition for rehearing en banc is DENIED because, at the request of one of its members, the court was polled, and a majority did not vote in favor of rehearing (Fed. R. App. P. 35 and 5th Cir. R. 35).

No. 21-10556

In the en banc poll, seven judges voted in favor of rehearing (Jones, Smith, Willett, Ho, Duncan, Engelhardt, and Oldham), and nine voted against rehearing (Richman, Stewart, Dennis, Elrod, Southwick, Haynes, Graves, Higginson, and Wilson).

No. 21-10556

James C. Ho, *Circuit Judge*, joined by Smith and Engelhardt, *Circuit Judges*, dissenting from denial of rehearing en banc:

In a country populated by well over 300 million people, we're bound to vociferously disagree on a wide range of issues. Indeed, the Anti-Federalists opposed the proposed United States Constitution and the creation of our national government for that very reason.

As the Anti-Federalists explained, "[h]istory furnishes no example of a free republic, any thing like the extent of the United States." Brutus I (Oct. 18, 1787), *in* 2 The Complete Anti-Federalist 368 (Herbert J. Storing ed. 1981). That's because, they cautioned, "a free republic cannot succeed over a country of such immense extent, containing such a number of inhabitants, . . . as that of the whole United States." *Id.* They warned that "[t]he laws and customs of the several states are, in many respects, very diverse, and in some opposite." *Id.* at 370. They feared that the proposed United States "would not only be too numerous to act with any care or decision, but would be composed of such heterogenous and discordant principles, as would constantly be contending with each other." *Id.* They worried that republics could prosper only if "the manners, sentiments, and interests of the people should be similar," as would only exist if the republic were "confined to a single city" or over a "small" territory. *Id.* at 369.

The Federalists, of course, prevailed. They predicted that we would be better off if we could come together as a single, unified country—that enormous diplomatic, military, economic, and other benefits would inevitably flow from scale. *See*, *e.g.*, The Federalist No. 14, at 99 (James Madison) (Clinton Rossiter ed., 1961) ("We have seen the necessity of the Union, as our bulwark against foreign danger, as the conservator of peace among ourselves, as the guardian of our commerce and other common interests."). And they promised that we would come together, and that Anti-

No. 21-10556

Federalist fears would not become reality, because our new national government would be one of limited powers—one that would respect our great diversity of viewpoints, by preserving community differences and local rules. *See, e.g., id.* at 102 ("[T]he general government is not to be charged with the whole power of making and administering laws. Its jurisdiction is limited to certain enumerated objects, which concern all the members of the republic, but which are not to be attained by the separate provisions of any. The subordinate governments, which can extend their care to all those other subjects which can be separately provided for, will retain their due authority and activity.").

But constitutional limits on governmental power do not enforce themselves. They require vigilant—and diligent—enforcement.

For too long, our circuit precedent has allowed the federal government to assume all but plenary power over our nation. In particular, our circuit precedent licenses the federal government to regulate the mere possession of virtually every physical item in our nation—even if it's undisputed that the possession of the item will have zero impact on any other state in the union. The federal government just has to demonstrate that the item once traveled across state lines at some point in its lifetime, no matter how distant or remote in time. *See United States v. Rawls*, 85 F.3d 240, 242–43 (5th Cir. 1996).

That is no limit at all. If the only thing limiting federal power is our ability to document (or merely speculate about) the provenance of a particular item, the Founders' assurance of a limited national government is nothing more than a parchment promise.

Rehearing this case en banc would have given us an ideal vehicle and welcome opportunity to reconsider our mistaken circuit precedent. I dissent from the denial of rehearing en banc.

No. 21-10556

\* \* \*

The Constitution creates a federal government of enumerated powers. *See* U.S. CONST. art. I, § 8. And those powers are "few and defined." *United States v. Lopez*, 514 U.S. 549, 552 (1995) (citing THE FEDERALIST NO. 45, at 292–93 (James Madison) (Clinton Rossiter ed., 1961)). *See also Marbury v. Madison*, 1 Cranch 137, 176 (1803) ("The powers of the legislature are defined, and limited; and that those limits may not be mistaken, or forgotten, the constitution is written."). This enumeration ensures "a healthy balance of power between the States and the Federal Government [and] reduce[s] the risk of tyranny and abuse from either front." *Lopez*, 514 U.S. at 552 (cleaned up).

But now consider the facts presented in this case: The federal government seeks to incarcerate a homeless man (and previously convicted felon) for possessing two shotgun shells that he found in a dumpster.

It's hard to imagine a more local crime than this. There's no record evidence that his possession of these items will have any impact on any other state. There's no record evidence of any commercial transaction of any kind involving the shells—or even that the shells traveled across state lines at any particular moment in time. All that's here is testimony that the manufacturer of shells that match the items possessed by Seekins manufactured those shells in another state.

A panel of this court was duty-bound to uphold the conviction as a matter of circuit precedent. *United States v. Seekins*, 2022 WL 3644185, \*2 (5th Cir. 2022). Accordingly, Seekins argues that *Rawls* and its progeny warrant en banc review because they are "premised on serious error" and are contrary to structural limits on the federal government's power under the Commerce Clause.

No. 21-10556

I agree. There must be *some* limit on federal power under the Commerce Clause. But our circuit precedent fails to recognize this. Our precedent on felon-in-possession statutes allows the federal government to regulate any item so long as it was manufactured out-of-state—without any regard to when, why, or by whom the item was transported across state lines. But that would mean that the federal government can regulate virtually every tangible item anywhere in the United States. After all, it's hard to imagine any physical item that has not traveled across state lines at *some* point in its existence, either in whole or in part.

The Supreme Court has repeatedly warned us that the Commerce Clause power "must be read carefully to avoid creating a general federal authority akin to the police power." *NFIB v. Sebelius*, 567 U.S. 519, 536 (2012). Yet our circuit precedent would allow just that. If it's enough that some object (or component of an object) at some unknown (and perhaps unknowable) point in time traveled across state lines to confer federal jurisdiction, it's hard to imagine anything that would remain outside the federal government's commerce power. There is no plausible reading of the Commerce Clause, as originally understood by our Founders, that could possibly give the federal government such reach. *See, e.g.*, *Lopez*, 514 U.S. at 585–587 (Thomas, J., concurring) (discussing the original meaning of the Commerce Clause). *See also* Randy E. Barnett, *The Original Meaning of the Commerce Clause*, 68 U. Chi. L. Rev. 101, 146 (2001) ("The most persuasive evidence of original meaning . . . strongly supports Justice Thomas's and the Progressive Era Supreme Court's narrow interpretation of the Congress's power [under the Commerce Clause]."); William J. Seidleck, *Originalism and the General Concurrence: How Originalists Can Accommodate Entrenched Precedents While Reining in Commerce Clause Doctrine*, 3 U. Pa. J. L. & Pub. Affs. 263, 269 (2018) ("The founding generation understood the term 'commerce' to mean only 'trade or exchange

No. 21-10556

of goods.' . . . The writings of the framers and the purpose behind the creation of the Commerce Clause also confirm its intended narrow scope.").

Indeed, every member of the panel in *Rawls* recognized this problem. The entire panel specially concurred, noting that "one might well wonder how it could rationally be concluded that mere possession of a firearm in any meaningful way concerns interstate commerce simply because the firearm had, perhaps decades previously before the charged possessor was even born, fortuitously traveled in interstate commerce." 85 F.3d at 243 (Garwood, J., specially concurring).

*Rawls* nevertheless affirmed the constitutionality of the conviction under the Commerce Clause because the panel believed that Supreme Court precedent required them to do so. In *Scarborough v. United States*, 431 U.S. 563 (1977), the Supreme Court held the then-operative felon-in-possession statute was satisfied merely by the firearm's transportation, at some point in time, across state lines. 431 U.S. 563, 577 (1977).

But our reliance on *Scarborough* was erroneous for at least two reasons. First, the Court's holding in *Scarborough* was statutory, not constitutional. *See Scarborough*, 431 U.S. at 567, 569–77. *See also* J. Richard Broughton, *The Ineludible (Constitutional) Politics of Guns*, 46 Conn. L. Rev. 1345, 1360 (2014). Second, *Scarborough* pre-dates *Lopez*, where the Court cabined the constitutional power of the federal government under the Commerce Clause. *See* 514 U.S. at 568.

A number of circuit judges nationwide have noted the fundamental inconsistency between *Lopez* and *Scarborough*. *See, e.g.*, *United States v. Kuban*, 94 F.3d 971, 977–78 (5th Cir. 1996) (DeMoss, J., dissenting) ("[T]he precise holding in *Scarborough* is in fundamental and irreconcilable conflict with the rationale of the United States Supreme Court in *United States v. Lopez*[.] . . . The mere fact that a felon possesses a firearm which was

transported in interstate commerce years before the current possession cannot rationally be determined to have a substantial impact on interstate commerce as of the time of current possession.") (quotation omitted); *United States v. Alderman*, 565 F.3d 641, 648–650 (9th Cir. 2009) (Paez, J., dissenting) (arguing the majority's upholding of the felon-in-possession-of-body-armor statute inappropriately extends *Scarborough* beyond the limits imposed by *Lopez*, *United States v. Morrison*, 529 U.S. 598 (2000), and *Gonzales v. Raich*, 545 U.S. 1 (2005)).

Moreover, Justice Thomas has criticized the misapplication of *Scarborough* to constitutional challenges under the Commerce Clause: "[Y]ears ago in *Lopez*, [the Supreme Court] took a significant step toward reaffirming th[e] Court's commitment to proper constitutional limits on Congress' commerce power. If the *Lopez* framework is to have any ongoing vitality, it is up to th[e] Court to prevent it from being undermined by a 1977 precedent that does not squarely address the constitutional issue." *Alderman v. United States*, 131 S. Ct. 700, 703 (2011) (Thomas, J., dissenting from the denial of the petition for writ of certiorari). "[P]ermit[ting] Congress to regulate or ban possession of any item that has ever been offered for sale or crossed state lines" would be "[s]uch an expansion of federal authority" as to "trespass on state police powers." *Id.* at 703.

In sum, our circuit precedent dramatically expands the reach of the federal government under the Commerce Clause. No Supreme Court precedent requires it. And no proper reading of the Commerce Clause permits it. We should have granted en banc rehearing to reconsider circuit precedent that—from its inception—circuit judges across the country have criticized for contravening our Constitution's limits on federal power.

No. 21-10556

\* \* \*

Americans disagree passionately over a wide range of issues—including a variety of criminal justice issues, such as whether felons should be punished for possessing firearms. *Compare, e.g.*, Dru Stevenson, *In Defense of Felon-in-Possession Laws*, 43 Cardozo L. Rev. 1573, 1577 (2022), *with* Conor Friedersdorf, *The Anti-gun Laws That Make Progressives Uneasy*, The Atlantic, Feb. 10, 2022 (noting that "recent criminal-justice reform[er]s" seek to "avoid prosecuting people for gun possession unless they were actually involved in violent crime"); Robert Weiss, *Rethinking Prison for Non-Violent Gun Possession*, 112 J. Crim. L. & Criminology 665 (2022); Zack Thompson, *Is it Fair to Criminalize Possession of Firearms by Ex-Felons?*, 9 Wash. U. Juris. Rev. 150 (2016).

In these sharply divided times, I can think of no better moment to reaffirm our Founders' respect for diverse viewpoints and restore the proper constitutional balance between our national needs and our commitment to federalism.

I dissent from the denial of rehearing en banc.